**George ARTHUR, et al., Plaintiffs,**

v.

**Ewald P. NYQUIST, et al., Defendants.**

**No. CIV–1972–325C.**

United States District Court,
W.D. New York.

Feb. 23, 1988.

David Gerald Jay, Buffalo, N.Y., for plaintiffs.

Aubrey V. McCutcheon, Jr., Special Counsel for the Buffalo Bd. of Educ., Detroit, Mich., for defendants Superintendent of Schools Eugene T. Reville and the Bd. of Educ.

Raichle, Banning, Weiss & Stephens (Arnold Weiss, of counsel), Buffalo, N.Y., for defendant Mayor James D. Griffin.

Falk & Siemer (Alvin M. Glick, of counsel), Buffalo, N.Y., for defendant Common Council of the City of Buffalo.

Jaeckle, Fleischmann & Mugel (J. Edmund deCastro, of Counsel), Buffalo, N.Y., for plaintiff-intervenor Community Advisory Bd. for Bilingual Educ. of Buffalo.

Bouvier, O'Connor, Cegielski & Levine (Bruce A. Goldstein, of counsel), Buffalo, N.Y., for plaintiff-intervenor John Bushey.

Robert Klingensmith, Buffalo, N.Y., for intervenor Buffalo Teachers Federation.

Lipsitz, Green, Fahringer, Roll, Schuller & James (John R. LoGalbo, of counsel), Buffalo, N.Y., for intervenor Buffalo Counsel of Sup'rs and Administrators.

CURTIN, Chief Judge.

The Buffalo, New York, Board of Education [the Board] and the Buffalo Teachers Federation [BTF] have jointly moved for interim modification of my order of August 8, 1980, commonly known as the one-for-one hiring order.

On September 10, 1987, the Board and the BTF submitted an interim order, to which other parties in the action filed specific written objections on September 17, 1987.[1] All parties met with the court to discuss the proposed order and the objections thereto on September 22 and 23, 1987. On October 9, 1987, the court directed the Board to submit further affidavits providing a statistical breakdown of minority hiring since August 8, 1980, and information on the Board's minority recruitment program. The Board submitted this information on October 29, 1987, and December 10, 1987.

I now approve the proposed interim order submitted by the Board and the BTF, with certain changes which respond to objections raised by other parties and to concerns of this court. In general, I note that at the time of my March 27, 1979, order, which first set forth the general hiring goals later addressed by the one-for-one order, minorities represented only 12.2 percent of the teaching staff in the Buffalo Public Schools. Order of March 27, 1979, p. 10. At present, minorities represent over 21 percent of the teaching staff in a number of tenure areas, and 20.3 percent of the total staff. Appendices, A, B, and C. While minority hiring has not yet attained the minimum requirement of 21 percent representation in each of the tenure areas specified by my August 8, 1980, order, it is clear that significant progress has been made in this direction. The Board must, as the order which follows emphasizes, continue to direct its most vigorous efforts to minority recruitment efforts in order to

---

1. Written objections were submitted by David Jay, counsel for plaintiffs; Bruce Goldstein, counsel for plaintiff-intervenors John Bushey, *et al.;* and J. Edmund deCastro, counsel for plaintiff-intervenor Community Advisory Board for Bilingual Education of Buffalo [CAB].

satisfy the minority hiring requirements. However, I believe that some interim modification of the August 8, 1980, order is now appropriate in order to partially remedy the plight of those majority teachers who have waited many years to attain permanent status. The agreement reached by the Board and the BTF, with some alteration, provides an acceptable partial remedy for this situation which does not adversely affect attainment of the minority hiring goals.

The order of the court follows; departures from the proposed order of the Board and BTF are underscored. The necessity for these changes is discussed in footnotes to the underscored sections.

### Order Modifying this Court's August 8, 1980, Order

#### 1. The Hiring Order

Both the Board and the BTF urge the use of paragraph 11(b) of the August 8, 1980, one-for-one hiring order to permit the granting of probationary appointments to a substantial number of non-minority teachers in selected tenure areas. The intervenors for the handicapped also support the concept.[2]

The plaintiffs and the Community Advisory Board for Bilingual Education of Buffalo [CAB] oppose the use of paragraph 11(b) for such purpose.

By way of pertinent background, the August 8, 1980, order established "the goal of hiring one minority for one majority for all positions, until the goal of twenty one percent (21%) minority employees has been reached ..." (Appendix to order, p. 3 ¶ 4). The "instructional staff" of the Buffalo Public Schools which the plan covers is composed of six classifications of employees: 1) central office and school building staff; 2) supportive school staff; 3) elementary teachers; 4) special area teachers; 5) remedial area staff; and 6) secondary teachers (Appendix to order, pp. 3–4 ¶ 6).

New hirees in the instructional services of the defendant Board were to be appointed to probationary (tenure track) positions in the ratio of one majority for every minority so hired. In the event there were no qualified minorities available for probationary appointment to a given position, only a temporary appointment could be made to that position (as well as to its counterpart, the corresponding majority position).

Paragraph 11(b) reads as follows:

In those extreme situations where the Board can factually demonstrate unavailability of qualified candidates to fill open positions, the Court may permit the Board to make probationary appointments.

Since the inception of the August 8, 1980, order, the number of temporary appointments required thereunder has continued to grow. It has become apparent that over the life of the order a sufficient number of qualified minority candidates to fill certain probationary positions within these categories has been and continues to remain unavailable. The Board has maintained a recruitment program which predates the August 8, 1980, order. Recently, that program was greatly expanded. The results of its implementation have been a partial, but not total, success. Whether the Board's increasing emphasis on recruitment will net further gain is unpredictable at this time. Accordingly, some interim relief is warranted, and paragraph 11(b) can be used for such purpose.

It is the intended nature of this interim relief that a) the relief be temporary—accordingly, the matter shall be brought back for review by the parties and the court no later than July 1, 1988; and b) the adaptations permitted preserve the opportunity for minority race placements in permanent positions sufficient to attain the 21 percent goal of the original order.

---

**2.** Intervenors for the handicapped make the following qualification on this point in their affidavit in response to the proposed order:

intervenors support the concept that, assuming the validity of the [Buffalo Teacher Exam], when its list of qualified minority teachers has been exhausted, the school system should hire majority teachers from the same list, on a "probationary" rather than on a "temporary" basis. Our position, however, is not based on the application of Paragraph 11, Subdivision (b) of the August 8, 1980 one-for-one hiring order.

Goldstein affidavit of September 23, 1987, ¶ 3.

■ Accordingly, to the extent that staffing of any of the six areas is less than 21 percent minority, the number of positions necessary to reach 21 percent in that given area will be reserved for qualified minority applicants. Each such reserved position will be filled by a qualified candidate under a temporary appointment until such time as a qualified minority candidate can be hired on a probationary appointment for that position.

By Appendix [A] (attached hereto), the Board has specified by name each of the tenure areas within each of the six instructional services categories. As to each of those tenure areas, the Board provides, *inter alia,* the following: 1) the total number of permanent tenure positions available for the 1987–88 school year within that tenure area; 2) the total number of minority employees occupying probationary and tenure positions within that tenure area; 3) the total number of majority candidates occupying probationary and tenure positions within that tenure area. The Board has calculated the number of minority positions required to equal 21 percent of the total available positions. For each category, the number of minority positions required to equal 21 percent of the total available positions shall be reserved for qualified minority probationary appointments. As to the remainder, hiring of probationary teachers can proceed without regard to the one-for-one hiring requirement.

The parties should also review each of the tenure areas included in each of the six categories in order to determine whether any of the positions falling therein are of a kind for which it is unlikely qualified minority candidates will be available within a reasonable time. The same analysis should be performed with respect to majority candidates. The parties should then consider whether those positions would be offsetting one to another or whether there should be some additional adjustments to take into account the realistic expectation of finding majority/minority candidates for those certain tenure positions while still preserving the overall 21 percent employment goal. If some offsetting adjustment appears warranted, appropriate application should be made to the court.

Since this is an interim order, not a final order, the Board is directed to continue its expanded recruitment efforts and to report in writing to the court its efforts and results therein on a quarterly basis. The court's continuation of the instant interim order depends upon the quality of these minority recruitment efforts. As I stated in my order of August 8, 1980, the desegregation plan for the Buffalo Schools "can succeed only if [the Board] undertakes a vigorous recruitment effort to locate, identify, and attract qualified minority applicants." Order of August 8, 1980, p. 14. All parties acknowledge that the Board has re-intensified its efforts in this respect recently. See Appendix C. It is of the utmost importance that such efforts continue. The Board's minority recruitment efforts should be given the highest priority and should be demonstrated in the Board's quarterly reports to the court.[3] These reports should minimally contain both a numerical and an anecdotal analysis of the Board's recruitment activities and the Board's success in filling the positions being reserved by the instant order for qualified minority candidates. The first such report should be submitted before August 1, 1988, and copies should be provided to all the parties for their analysis.

---

**3.** The fundamental circumstance necessitating this interim order is the exhaustion from year to year of the list of qualified minority teachers. Once such exhaustion occurs, majority teachers can be appointed only to temporary, not probationary, positions, due to the requirements of the one-for-one hiring order. A successful minority recruitment effort by the Board is the ultimate solution to this problem. All parties acknowledge that the Board has recently reintensified its efforts on this score, and the court is mindful that similar efforts by many other school districts, as well as other factors, create difficulties for the Board's recruitment program. *See* Appendix C. However, the language added here to the proposed order is intended to make it emphatically clear that the court expects from the Board a minority recruitment effort of the highest quality. Therefore, the court renders the instant order as an interim order, and its continuation is highly dependent upon a continued showing of the most vigorous minority recruitment efforts by the Board.

### 2. The Buffalo Teacher Examination [BTE]

A motion has been made by CAB requesting the court to order the Board to discontinue its use of the BTE.

The BTE is composed of three parts: 1) the PPST (Pre-professional Skills Test); 2) an interview, and 3) a subject area test. The BTE performs two major functions: 1) it rank-orders employment candidates for hiring; and 2) it results in local licensing of those passing it. As to the latter, Buffalo and New York City license and hire teachers without regard to whether the candidates have New York State (or any other) certification (which they may do under state law so long as 1) the local licensing requirements are not less stringent than the requirements for New York State certification; and 2) the applicant passes the local licensing requirements).

Since 1984, New York State certification requirements include that the state certification candidate take and pass the National Teachers Exam [NTE].

CAB urges that the PPST component of the BTE is discriminatory because disproportionately more minorities than majorities fail it. Because of this, CAB has maintained that New York State certification should replace local licensing. However, the Board accepts post–1984 NTE passing test scores as the equivalent of PPST passing test scores. No claim has been made that the NTE is discriminatory. The NTE is the testing component in New York State certification. The NTE passing score required by New York State for New York State certification is deemed the passing NTE score equivalent of a passing PPST score.

■ No evidence has been presented that the interview portion or the subject matter portion of the BTE are discriminatory. Teaching candidates who were New York State certified before 1984 (*i.e.*, before the NTE was required for New York State certification) are allowed to take either the PPST or the NTE, with the following exception: the PPST/NTE will be waived for those candidates who have taught for at least three years (not necessarily successive) and who have been evaluated on the district's evaluation form for those years as eligible to continue teaching (provided that one of those evaluations must have been performed after September 1, 1986).[4] In consideration of the above, the motion to discontinue the use of the BTE is denied.

During this interim order and in conjunction therewith, the parties shall also meet with the court on such date(s) as the court may set. Each party is free to apply to the court for such meeting(s) or by motion for specific relief.

So ordered.

### APPENDIX A

### AFFIDAVIT

MARY L. GLATT, being duly sworn, deposes and says:

1. I am employed by the Buffalo Public School System as Director of Affirmative Action.

I

2. During the period July 23, 1987 through August 6, 1987, I gathered the information necessary to prepare the attached Appendix A in the regular course of my employment.

3. I prepared Appendix A by:

A. Completing a count of each instructional tenure area specified in the August 8, 1980 Court Order by race and status—contract, probationary, temporary—of each individual employed in the tenure area.

---

**4.** This date is a change from the proposed order, which provided that one evaluation must have been performed after September 1, *1987*. This change responds to concerns expressed by counsel for plaintiffs at the September 23, 1987, oral argument on the proposed order. Counsel for plaintiffs indicated that under the proposed order, the evaluation process for teachers could be made more difficult in the current year, so as to sharply reduce the number who would otherwise be eligible for probationary status under this provision of the order. The Board indicates that it has no intention to make any such change in evaluation procedure; the change made here from "1987" to "1986" should remove any concern on this issue.

B. Contacting each department/tenure area administrator to review the information and confirm that these figures accurately reflected their 1987–88 staffing requirements.

C. Identifying the total number of permanent positions in each tenure area [Column 1 (C–1)], and the number of probationary and permanent minority and white employees in each tenure area [Columns 2 & 3 (C–2 & 3)].

D. Determining the total number of minority positions needed to meet or exceed the 21 percent minority staff representation on a permanent basis, i.e. probationary or permanent minority positions [Column 4 (C–4)].

E. Subtracting the current number of probationary and permanent minority staff (C–2), from the minority positions required (C–4), to identify the number of minorities needed [Column 5 (C–5)] to meet or exceed the 21 percent minority staff representation requirement.

F. Using the total number of permanent positions in each tenure area (C–1), minus the minority positions required (C–4), to determine the maximum number of majority positions for each of the areas.

G. Delineating projections for majority staff employment in each tenure area consistent with the number of minority staff positions needed to meet the 21 percent minority staff representation requirement [Columns 6 through 12 (C–6–12)].

4. Appendix A shows the procedure outlined above as completed for each tenure area specified in the August 8, 1980 Court Order. For example, in the Library tenure area, the total permanent position count is 66 (C–1). The total of minority probationary and permanent positions is 10 (C–2), and the total of probationary and permanent majority positions is 43 (C–3). Based on a total staff of 66, fourteen (C–4) permanent and probationary minorities are needed to meet or exceed the 21 percent staff requirement. Fourteen minority positions equals 21.2 percent of the total staff.

Since 10 permanent and probationary minority teachers are currently employed in the area, an additional four (C–5) minorities, eligible for probationary positions, must be employed.

The maximum majority positions in this area is 52 (C–6), if minorities must equal 21 percent of the total per (C–6). Forty-three majorities hold probationary or permanent positions. Nine additional majorities (C–7), could hold probationary and permanent positions, if the minority staff equalled 21 percent of the total. The 13 (C–8) filled temporary positions reflect the difference between the 66 total permanent positions (C–1), and the 53 permanent minority and majority permanent and probationary positions (C–2 & 3).

The six fillable permanent positions (C–9) are based on the number of probationary appointments that can be made on a one-for-one basis, as the Library tenure area is below 21 percent minority staff representation. This assumes the use of the 1987 teacher examination list for minority candidates, resulting in three minority and three majority probationary appointments for the 1987–88 school year. Seven (C–10) positions would remain temporary under the one-for-one hiring mandate.

Subtracting the three majority appointments from the nine (C–7) available allows for a maximum of six additional majority appointments under the 21 percent guideline (C–11), all six of which could be probationary (C–12). One appointment (C–10) would be reserved, i.e. remain temporary until a minority candidate, eligible for probationary status, is appointed. The Library tenure area would then achieve 21.2 percent minority staff representation.

## II

5. During the period between October 9, 1987 and October 26, 1987, I prepared Appendix B in response to the request of our legal counsel. Appendix B shows the statistical breakdown of the hiring of minorities since the 1980, one-for-one hiring order. The information reflects the hiring as of June of each year with the exception of the English as a Second Language

(E.S.L.) tenure area. This tenure area was approved by the Board in August, 1987. The hiring figures for this area are as of October 20, 1987.

The minority staff statistics indicate the numbers of minorities hired on a probationary basis leading to permanency and the number of temporary appointments for each tenure area for each year. The tenure areas are listed under the instructional categories defined in the August 8, 1980 Court Order. The information on the charts is arranged as listed below:

Column 1—Tenure Area

Column 2—Year

Column 3—Minority New Hires by Status (Probationary—Temporary)

Column 4—Minority Staff Percentage

Explanations have been provided where changes have occurred in specific tenure areas or where new tenure areas have been created.*

Mary L. Glatt
(s) Mary L. Glatt

* For purposes of this order, Appendix B reflects only a staff-wide compilation of the statistics referred to in Ms. Glatt's affidavit. The statistical breakdown prepared by Ms. Glatt is part of the public record in this action, filed in the Office of the Clerk, United States District Court, Western District of New York.

## Appendix A

| | | Total Permanent Positions | Prob and Permanent Minority | Prob and Permanent Majority | Minority Positions Required | Minority Needed | Maximum Majority Positions | Available Majority Positions | Filled Temporary Positions | Fillable Permanent Positions | Remaining Positions | Possible Majority Appointment | Available Majority Appointment |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| S | Attendance | 24 | 3 | 22 | 5 | 2 | 19 | -3 | -1 | 0 | 0 | 0 | 0 |
| S | Guidance | 95 | 22 | 70 | 20 | 0 | 75 | 5 | 3 | 4 | 0 | 3 | 0 |
| S | Library | 66 | 10 | 43 | 14 | 4 | 52 | 9 | 13 | 6 | 7 | 6 | 6 |
| S | School Psychologist | 31 | 6 | 19 | 7 | 1 | 25 | 6 | 6 | 2 | 4 | 5 | 4 |
| S | Social Worker | 20 | 3 | 7 | 4 | 1 | 16 | 9 | 10 | 11 | 0 | 3 | 0 |
| | Support Staff | 236 | 44 | 161 | 49 | 8 | 186 | 25 | 31 | 23 | 11 | 17 | 10 |
| R | Corr Math | 48 | 3 | 46 | 10 | 7 | 38 | -8 | -1 | 0 | 0 | 0 | 0 |
| R | Reading | 82 | 15 | 68 | 17 | 2 | 65 | -3 | -1 | 0 | 0 | 0 | 0 |
| | Remedial Staff | 130 | 18 | 114 | 27 | 9 | 103 | -11 | -2 | 0 | 0 | 0 | 0 |
| E | Bil n-6 | 30 | 24 | 4 | 6 | 0 | 24 | 20 | 2 | 5 | 0 | 18 | 0 |
| E | K-6 | 929 | 140 | 633 | 195 | 55 | 734 | 101 | 156 | 40 | 116 | 81 | 81 |
| | Elementary Staff | 960 | 164 | 687 | 201 | 55 | 758 | 121 | 159 | 45 | 116 | 99 | 81 |
| C | Business | 66 | 15 | 48 | 14 | 0 | 52 | 4 | 3 | 0 | 3 | 4 | 3 |
| C | Bilingual | 38 | 6 | 7 | 8 | 2 | 30 | 23 | 25 | 0 | 25 | 23 | 23 |
| C | Dance | 3 | 1 | 2 | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| C | English | 176 | 28 | 146 | 37 | 9 | 139 | -7 | 2 | 2 | 0 | 0 | 0 |
| C | For. Language | 80 | 10 | 41 | 17 | 7 | 63 | 22 | 29 | 10 | 19 | 17 | 17 |
| C | Math, Secondary | 134 | 12 | 107 | 28 | 16 | 106 | -1 | 15 | 6 | 9 | 0 | 0 |
| C | Science | 146 | 16 | 113 | 31 | 15 | 116 | 3 | 17 | 2 | 15 | 2 | 2 |
| C | Social Studies | 162 | 10 | 149 | 34 | 24 | 128 | -21 | 3 | 4 | 0 | 0 | 0 |
| C | Vocational Education | 112 | 11 | 77 | 24 | 18 | 89 | 12 | 24 | 4 | 20 | 10 | 10 |
| | Secondary Staff | 917 | 109 | 690 | 193 | 85 | 724 | 34 | 118 | 28 | 91 | 55 | 54 |
| A | Art | 64 | 4 | 61 | 13 | 9 | 50 | -11 | -1 | 0 | 0 | 0 | 0 |
| A | E.S.L. | 25 | 0 | 0 | 5 | 5 | 20 | 20 | 25 | 9 | 16 | 15 | 15 |
| A | Home Economics | 45 | 7 | 36 | 9 | 2 | 35 | -1 | 2 | 0 | 2 | 0 | 0 |
| A | Ind. Arts | 54 | 2 | 49 | 11 | 9 | 43 | -6 | 3 | 0 | 3 | 0 | 0 |
| A | Music, Vocal | 49 | 18 | 33 | 10 | 0 | 39 | 6 | -2 | 2 | 0 | 5 | 0 |
| A | Music, Instrumental | 27 | 2 | 22 | 6 | 4 | 21 | -1 | 3 | 0 | 3 | 0 | 0 |
| A | Physical Education | 120 | 17 | 104 | 25 | 8 | 95 | -9 | -1 | 0 | 0 | 0 | 0 |
| A | Physically Hand. | 44 | 5 | 29 | 9 | 4 | 35 | 6 | 10 | 0 | 0 | 0 | 0 |
| A | Special Education | 572 | 86 | 201 | 120 | 34 | 452 | 251 | 285 | 12 | 261 | 239 | 239 |
| A | Speech | 88 | 12 | 52 | 19 | 7 | 70 | 18 | 24 | 24 | 20 | 16 | 16 |
| | Special Area Staff | 1087 | 153 | 587 | 228 | 83 | 859 | 272 | 347 | 51 | 304 | 274 | 269 |
| | Grand Total | 3329 | 488 | 2189 | 699 | 240 | 2630 | 441 | 652 | 147 | 522 | 445 | 414 |

| COLUMN | HEADING | DESCRIPTION |
|---|---|---|
| 1 | None | Title of Each Area |
| 2 | Total Permanent Positions | Estimated permanent positions to be available September 1, 1987 |
| 3 | Probationary and Permanent Minority | Actual number of minority persons holding permanent or probationary appointments |
| 4 | Probationary and Permanent Majority | Actual number of majority persons holding permanent or probationary appointments |
| 5 | Minority Positions Required | Minimum number of minority persons holding probationary and permanent positions in order to represent 21% of the total |
| 6 | Minority Needed | Number of additional minority persons needed to reach 21% minority in each teaching area |
| 7 | Maximum Majority Positions | Maximum number of majority persons employed in permanent and probationary positions if minority persons must equal 21% of the total |
| 8 | Available Majority Positions | Maximum number of majority persons who could hold probationary and permanent positions if minority persons equalled 21% of the total |
| 9 | Filled Temporary Positions | Number of positions out of the total not filled by active permanent or probationary persons (Column 2 less (Column 3 + Column 4)) |
| 10 | Fillable Permanent Positions | Number of positions for which there are available candidates who may be appointed, on a one for one basis where necessary. Assumes use of 1987 list for minority appointments |
| 11 | Remaining Positions | Number of positions now temporary remaining after filling all fillable permanent positions |
| 12 | Possible Majority Appointments | Maximum number of majority appointments possible under 21% guideline |
| 13 | Available Majority Appointments | Number of majority probationary appointments which may be made while reserving enough positions to achieve 21% minority staff |

APPENDIX B

BUFFALO PUBLIC SCHOOLS
Buffalo, New York

Affirmative Action Office

MINORITY STAFF PERCENTAGE
June, 1981—June, 1987

| June, 1981 | 15.9 |
|---|---|
| June, 1982 | 17.2 |
| June, 1983 | 17.6 |
| June, 1984 | 18.0 |
| June, 1985 | 19.1 |
| June, 1986 | 20.1 |
| June, 1987 | 20.3 |

COMPILATION OF STATISTICS
FROM PRIOR SUBMISSIONS

DECEMBER 10, 1987

* Attachments referred to in this summary, delet-

APPENDIX C

[Excerpted from the Buffalo Board of Education's Responses to the November 17, 1986, order of the court, submitted January 20, 1987.]

BUFFALO BOARD OF EDUCATION

BUFFALO, NEW YORK

AFFIRMATIVE ACTION OFFICE

MINORITY RECRUITMENT INFORMATION SUMMARY *

The Affirmative Action Office plans to continue and enhance minority instruction-

ed for purposes of this Order, are part of the

al staff recruitment activities in compliance with the August 8, 1980 Court Order. The planned activities are the result of a number of efforts undertaken by the Affirmative Action Office to assess the most effective strategies to increase minority staff representation.

A compilation of Affirmative Action hiring (See Attachment 1) and staff statistics between June, 1981 and June, 1986 (See Attachment 2) provided a review of the Affirmative Action minority instructional recruitment. This review indicated that ten instructional areas are above the 21 percent minority staff representation. Seven instructional areas have not met the 21 percent minority staff representation mandate due to staff stability and/or staff reductions and twelve areas remain below the 21 percent because minority staff hiring has not been sufficient to reach the Court requirement. In the foreign language area, staff reductions in accordance with Court ordered guidelines, between 1982 and 1985 impacted on minority staff representation. The Corrective Reading tenure area minority staff representation was similarly affected by staff reductions in accordance with Court ordered guidelines.

As can be seen on the individual tenure area minority staff representation charts (See Attachment 2), in the Foreign Language, Secondary Mathematics, Corrective Reading, Science, and Vocational Education tenure areas, temporary appointments on a one-for-one basis exceeded the number of probationary appointments between June, 1981 and June, 1985. This indicates that permanent position vacancies, eligible for probationary appointments leading to permanent contract status, were available on a limited basis in these tenure areas.

In order to intensify minority instructional staff recruitment in the most effective way, the Affirmative Action Office contacted Council of Great City School Affirmative Action and/or Personnel Directors to discuss their recruitment programs, successful recruitment strategies and barriers that

were encountered in locating minority instructional staff candidates (See Attachment 3). Also, a College and University Minority Student Enrollment Survey was distributed to 247 colleges and universities to determine the availability of minority teacher candidates in the tenure areas where the Buffalo Public Schools need additional minority staff to meet the 21 percent instructional staff representation (See Attachment 4). The results of these two efforts confirmed that a shortage of minority teacher candidates exists for the tenure areas where the Buffalo Board of Education needs minority teachers; that the competition for available minority candidates is intense; that this competition is aggravated by business and private industry recruitment and that school systems have initiated a number of procedures and programs to implement the attraction, retention, and retraining of minority candidates and minority teachers. The attached newspaper articles also highlight concerns relative to the preparation and availability of minority teacher candidates (See Attachment 5).

The Affirmative Action Office also reviewed an American Management Association Report on Hiring Costs and Strategies (See Attachment 6), that offered additional information on successful recruitment strategies. The Affirmative Action Office also contacted the Special Education Office to review the S.E.T.R.C. teacher retraining program implemented by the Board to retrain teachers, in areas of teacher surplus, to meet certification requirements in Special Education. This program proved successful in maintaining employment for teachers who would otherwise have been excessed from teaching positions and provided additional minority staff for the Special Education tenure area.

Based on the information elicited from these efforts, and an assessment of the staff attrition between June, 1980 and June, 1986, (See Attachment 8) as well as staff retirement projections for the next

public record in this action, filed in the Office of the Clerk, United States District Court, Western District of New York.

five years (See Attachment 9) the Affirmative Action Office has planned or is in the process of:

—The development of a Buffalo Public School public relations packet designed to attract minority students to teach and live in the city of Buffalo (See Attachment 10). This packet will be used for on-site and written recruitment communications with colleges, universities, community agencies, and individuals.

—Scheduled on-site recruitment at the N.F.C.P.A. Recruitment Days, Rochester and Central New York Recruitment Days and the Joint Teacher Recruitment Day at North Carolina A & T College and University of North Carolina.

—Is contacting Directors of Placement at Bowie, Cheyney, Howard, Hampton, and Lincoln Colleges and Universities to arrange participation in their spring teacher recruitment days.

—Continued dissemination of instructional staffing needs information to colleges, universities, community agencies, churches, and fraternities and sororities with predominantly minority representation.

—Continued use of the media through both paid and public service advertisements and announcements to attract minority teacher candidates.

—Continued contact with minority individuals to inform them of teaching opportunities in Buffalo.

—Expansion of existing relationships with local college and university Directors of Affirmative Action and Placement to identify promising minority candidates and provide encouragement and assistance in pursuing teaching certification.

—Continued exploration into the possibility of District development of teacher retraining programs to recertify teachers in surplus tenure areas where Buffalo needs teachers.

—Assessment of and investigation into the possibility of adapting existing district policies regarding teacher certification requirements and salary schedules.

—Discussions with the Deputy Superintendent relative to on-site recruitment teams being able to offer temporary positions to qualified minority candidates after a satisfactory interview by the team.

The completion of the planned activities outlined above, should provide sufficient minority candidates to meet the 21 percent minority staff representation goal, in tenure areas below this representation, within a three year period.